AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>**SHELIAN CHERINE ALLEN**<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 22-801M(NJ)<br>)<br>)  22-6046-Hunt<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of ___01/01/2020 - present___ in the county of _____ in the
___Eastern___ District of ___Wisconsin___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1341<br>18 U.S.C. Section 1343<br>18 U.S.C. Section 1349 | Conspiracy to commit fraud by wire, and conspiracy to commit fraud by mail |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

HSI Special Agent Thomas M. Koch
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: 2/2/2022

_____
*Judge's signature*

City and state: ___Milwaukee, Wisconsin___

Honorable Nancy Joseph
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| United States of America | ) |
|---|---|
| v. | ) |
| SHELIAN CHERINE ALLEN | ) Case No. 22-801M(NJ) |
| | ) |
| | ) |
| | ) |
| Defendant | ) |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     Shelian Cherine Allen                                                                                                             ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☑ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:
See Attached Affidavit.

Date:    02/02/2022

_____
*Issuing officer's signature*

City and state:    Milwaukee, WI

Honorable Nancy Joseph
*Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____        Weight: _____

Sex: _____        Race: _____

Hair: _____        Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

## AFFIDAVIT

I, Thomas M. Koch, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with Homeland Security Investigations (HSI), an investigative branch of the United States Department of Homeland Security (DHS) and have been employed by DHS as a federal law enforcement officer since August 2010. In my employment, I have conducted investigations involving both criminal and administrative violations of federal laws concerning a variety of both immigration and customs investigations to include financial fraud investigations. I have received specialized training from the Federal Law Enforcement Training Centers in Artesia, New Mexico; Charleston, South Carolina; and Glynco, Georgia in the laws and regulations relating to federal statutes, including various types of fraudulent schemes and activities related to wire fraud.

2. The information contained in this affidavit is based primarily on information I learned during the course of my investigation into the alleged criminal activity of Shelian Cherine ALLEN, and other known and unknown conspirators. I have also reviewed reports from this investigation prepared by other law enforcement officers, including investigators with the Brown County Sheriff's Office in Green Bay, Wisconsin (BCSO); Postal Inspectors with the U. S. Postal Inspection Service; and other law enforcement agencies from throughout the United States and Jamaica. As the reports were prepared by other law enforcement officers during the course of their official duties, I believe them to be reliable.

3. The purpose of this affidavit is to provide information to show there is probable cause to believe Shelian Cherine ALLEN, and other known and unknown conspirators have conspired to commit fraud by wire, and conspiracy to commit fraud by mail in violation of 18 U.S.C. § 1341, 1343, and 1349. Summarized, beginning in approximately 2019 and continuing

1

until the present, the defendant conspired with others to devise and carry out a telemarketing and mass marketing scheme that targeted vulnerable victims in order to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises. ALLEN and her co-conspirators, herein referred to the *Allen Lottery Scheme Organization,* identified United States citizens who were elderly and had access to financial resources. Once an individual was targeted, the *Allen Lottery Scheme Organization* would contact the selected victim and inform the victim they had won a large lottery which they called the "Publishers Clearing House Sweepstakes." Victims were told they needed to pay fees in order to get their winnings and would be contacted by phone until all of their resources were depleted. ALLEN and other co-conspirators did so by unlawfully, willfully, and knowingly conspiring together, and agreeing together to devise a scheme for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and to transmit or causes to be transmitted the money or property by means of wire transfers, postal money orders, bulk cash transfers, the mail, and other means which affected interstate and/or foreign commerce. As a result of this conspiracy, ALLEN has been able to fraudulently enrich herself as well as her co-conspirators while ruining the lives of many of the victims.

## OVERVIEW OF JAMAICAN LOTTERY SCHEMES

4.     A Jamaican Lottery Scheme is a form of mass-marketing fraud committed via the Internet, telemarketing, and/or mass mailings. Jamaican criminal organizations contact victims and regularly identify themselves as lawyers, government officials, law enforcement agents, lottery company officials, and others. The potential victims are led to believe they have won an international multi-million-dollar lottery sweepstakes. The fraudulent telemarketers tell the victims they will have to pay an advance fee in order to receive their winnings. This fee is usually

2

described as a tax, insurance payment, or customs duty which must be paid to release the winnings. The victims are instructed to send the funds and/or property via mail, bank transfer, or wire transfer. The winnings are invariably nonexistent, and the scammers obtain the funds that belonged to the victims.

5. The scammers routinely involve other victims to facilitate the laundering of financial transactions by receiving and negotiating financial instruments, receiving, and withdrawing funds from bank accounts, and transferring funds to either unknowing victims or to fellow co-conspirators.

6. In an attempt to conceal and/or layer the proceeds from the lottery scams, the scammers direct victims to send funds, knowingly and unknowingly, to other victims and/or associates of the scammers within the United States and/or Jamaica. These victims and/or co-conspirators then transfer the proceeds of fraud to the scammers in Jamaica by wire transfer, sending monetary instruments via the mail, or other means in effort to circumvent law enforcement's investigative efforts.

7. The Jamaican criminal organizations have modified the lottery scam into other variations of telemarketing schemes to include redirecting postal money orders, bulk cash smuggling, direct deposits, re-routing schemes, and identity theft schemes.

8. The Jamaican scammers have expertise in finding vulnerable victims (the elderly, those with physical or mental disabilities, etc.) and using their skills to obtain identifying information from individuals whom they call in the United States.

9. Some of the victims are contacted by someone else in the scam and are told they have won some type of lottery; however, as described above, there is no lottery and there are no winnings.

10. The co-conspirators or unknowing victims are then directed to transfer the proceeds of the fraud to the scammers in Jamaica, or elsewhere, by wire transfer, or other means with the goal of fraudulently enriching the co-conspirators. In addition, the victims are often told to send money or property to others in the United States or Jamaica.

11. As these scams usually utilize many individuals, different names (both real and fictitious), financial instruments, and instructions that are given orally on the telephone, the scam is almost impossible to trace, and usually results in money being fraudulently taken and diverted to Jamaica.

## ALLEN LOTTERY SCHEME AND ORGANIZATION

12. In August 2020, the Brown County Sheriff's Office (BCSO) was contacted by Adult Protective Services on behalf of an elderly victim herein referred to Victim-1, who resides in Brown County, Wisconsin. Victim-1 told law enforcement, in substance, that Victim-1 had been contacted by unknown individuals in the summer of 2019 who claimed to be representatives of the Publishers Clearing House. Victim-1 stated there was music in the background so as to make the call appear more realistic and the caller told Victim-1 that Victim-1 had won a house, a Mercedes Benz, and $18 million. Victim-1 was told to keep the fact that Victim-1 had won this lottery a secret and not tell Victim-1's bank about the winnings. The calls did not stop; Victim-1 received calls day and night. Others, also claiming to be lottery representatives for the lottery they claimed she won, continued to contact Victim-1, usually by phone, and directed Victim-1 to send money in cash, postal money orders, and personal and cashier's checks to different individuals in both the United States and Jamaica. Often, Victim-1 was provided information by the co-conspirators including specific banking information such as account numbers. Victim-1 was then instructed to withdraw money, convert the money into money orders, and then deposit Victim-1's

4

money orders directly into those specific accounts identified by the co-conspirators. Victim-1 was also directed to send money using postal money orders to others whom Victim-1 did not know. In addition, Victim-1 was also told to send bulk cash to yet other co-conspirators in order to receive her winnings. Victim-1 believed that Victim-1 had won the Publishers Clearing House Lottery and that is why she kept following the directions given by the conspirators. However, Victim-1 ultimately had to sell Victim-1's house and lost around $150,000 as a result of the fraud scheme. Of course, Victim-1 never received any winnings as this was a fraudulent scheme.

13. In November 2020, the United States, including the U.S. Department of Homeland Security, and U.S. Postal Inspection Service, received information from the Brown County Sheriff's Office in Green Bay, Wisconsin, and began investigating the international criminal organization, identified herein as the *Allen Lottery Scheme Organization*. This organization preys on vulnerable and/or elderly individuals in the Eastern District of Wisconsin and elsewhere in the United States. Members of the *Allen Lottery Scheme Organization* contact individuals whom they believe are vulnerable, and/or elderly and falsely state that the victims have won a lottery, the Publishers Clearing House Lottery, as part of the *Allen Lottery Scheme Organization*. The co-conspirators then convince these victims to send money or other property to individuals throughout the United States and Jamaica under the guise that these payments are needed in order to receive their lottery winnings. Law enforcement have determined that one of the leaders of the organization is Shelian Cerine ALLEN, a Jamaican National, and a Jamaican Constabulary Force (JCF) Police Officer.

**FRAUD PROCEEDS SENT TO ALLEN AND OTHER CO-CONSPIRATORS**

14. Once Victim-1 was identified, law enforcement began to trace money payments from Victim-1 to those directed by the callers. By doing this review, several co-conspirators were

5

identified, as were numerous bank accounts used to send the fraud proceeds. For example, on February 12, 2020, Victim-1 purchased a Cashier's Check (Check #: 26444) at Fox Communities Credit Union payable to Shelian ALLEN, in the amount of $6,000. Victim-1 was directed by co-conspirators on the telephone to deposit this check into PNC Bank Account #: 1235165824 in order to secure her lottery winnings. On February 14, 2020, Victim-1 deposited Check # 26444 into PNC Bank Account 1235165824 as directed.

15. Similarly, on April 21, 2020, Victim-1 wrote a Personal Check (Check #: 1344) via her Fox Communities Credit Union account payable to Shelian ALLEN, in the amount of $4,000. Victim-1 was given instructions from the scammers via a phone call to deposit this check into PNC Bank Account #: 1235165824 in order to secure her lottery winnings. On April 22, 2020, Victim-1 deposited Check #: 1344 into PNC Bank Account 1235165824 as directed.

16. Again, on or about July 9, 2020, during a phone call from the scammers, Victim-1 was given instructions from the scammers to send $30,000 inside a crockpot to Co-Conspirator #1 at an out-of-state address. Again, Victim-1 was led to believe Victim-1 had to send the cash in order to secure the lottery winnings. Victim-1 further explained that she sold her house, based on her belief that she had won the Publishers Clearing House sweepstakes, in order to obtain the $30,000 in cash.

## INTERVIEW OF CO-CONSPIRATOR # 1 & THE IDENTIFICATION OF ALLEN

17. I have reviewed a non-custodial telephonic interview from the fall of 2020, between BCSO Detective Sergeant R. Aronstein and Co-Conspirator #1. The interview was not compensated in any way. Co-Conspirator #1 is an American citizen who travels often to Jamaica.

18. During the interview, Co-Conspirator #1 stated he/she met a female Jamaican police officer known by the name of "Shelly" in a market in Jamaica. Co-Conspirator #1 explained

6

he/she knew this female personally as she would purchase groceries from him/her at the market. Co-Conspirator #1 stated some of the times he/she met with "Shelly" she was in uniform and other times she was not. Co-Conspirator #1 stated that during one of the meetings, "Shelly" approached him/her and talked about some money in the United States and asked if Co-Conspirator #1 could help get it for her. Co-Conspirator #1 explained that "Shelly" asked for Co-Conspirator #1's United States address, indicating she had something to ship, and asked if Co-Conspirator #1 could ship it to her. Co-Conspirator # 1 stated he/she agreed to assist "Shelly" because she is a police officer.

19. Co-Conspirator # 1 described one incident when he/she received an $11,000 check in the mail and just tore it up. Co-Conspirator #1 acknowledged he/she believed there was some sort of fraud going on.

20. Co-Conspirator #1 recalled possibly receiving a call from "Shelly" stating people were going to send cash. Co-Conspirator #1 also stated on another occasion, he/she received cash inside a crockpot or a rice cooker. Co-Conspirator #1 explained when he/she looked in the crockpot it appeared there was a lot of money, not wrapped, and consisted of $100 bills. Co-Conspirator #1 explained there appeared to be more than $10,000 and admitted it could have been more than $20,000. Co-Conspirator #1 stated that "Shelly" instructed him/her to send $21,000 of the cash and leave $9,000 behind. Co-Conspirator #1 admitted he/she kept the $9,000 in cash and sent $21,000 in cash to Jamaica, as directed by "Shelly." Co-Conspirator #1 subsequently acknowledged he/she believed the $9,000 was a fee they were being paid by "Shelly" for accepting and shipping the package. Co-Conspirator #1 explained he/she shipped a package containing the cash, Ensure, soaps, detergent, and other miscellaneous items to Jamaica. Co-Conspirator #1 stated he/she addressed the package to himself/herself and shipped it to the hotel where Co-

7

Conspirator #1 usually stays when in Jamaica. Co-Conspirator #1 explained he/she then recovered the package from the hotel in Jamaica and traveled to the market where he/she gave the money to "Shelly." This account of the bulk cash shipment to Co-Conspirator #1 is consistent with the account provided by Victim-1 regarding being told to send $30,000 in cash in order to claim the lottery winnings (see paragraph 16 above).

21. Co-Conspirator #1 stated he/she felt responsible and offered to pay the $9,000 back. I have reviewed a non-custodial interview from the fall of 2020, between USPIS Inspector D. Riley, HSI Special Agent B. Anderson, and Co-Conspirator #1 conducted in Jamaica. This interview was not compensated in any way.

22. During the interview, Co-Conspirator #1 again told law enforcement he/she met a female Jamaican police officer known as "Shelly," in the Falmouth (Jamaica) Market. Co-Conspirator #1 explained he/she first me "Shelly" approximately six (6) years prior to the interview. When Co-Conspirator #1 was shown a picture of ALLEN, he/she confirmed the female in the photograph was the person Co-Conspirator #1 knows as "Shelly." Additionally, Co-Conspirator #1 provided a phone number of (876) 587-0634 for ALLEN.

## ANALYSIS OF ALLEN'S INTERNATIONAL TRAVEL

23. I conducted a search of DHS databases regarding ALLEN's international travel. DHS databases indicate that ALLEN has entered the United States from Jamaica nine (9) times from January 2019 through September 2021.

24. One of those visits to the United States included the following travel: on February 13, 2020, ALLEN entered the United States via Southwest Airlines Flight #1113 from Montego Bay, Jamaica, to Fort Lauderdale, Florida. On February 22, 2020, ALLEN departed the United

8

States via Southwest Airlines Flight #1024 from Ft. Lauderdale, Florida, to Montego Bay, Jamaica. Records indicate the next time ALLEN visited the United States was on November 28, 2020.

25. On September 1, 2021, I received information from an HSI Special Agent at the Fort Lauderdale International Airport in Fort Lauderdale, Florida, regarding ALLEN applying for entry into the United States following her arrival on a flight from Jamaica. ALLEN was referred to secondary inspection where Customs and Border Protection (CBP) Officers and an HSI Special Agent interviewed ALLEN as well as conducted a border search of her luggage and cellular telephones.

26. During the interview, ALLEN stated she has been a member of the Jamaican Constabulary Force for the past eighteen (18) years. ALLEN described her daily work routine as general police duty, which includes patrolling, court duty, and office duty. During the inspection, ALLEN voluntarily provided CBP Officers her cell phone to be examined. She further stated that her cell phone was not locked. The cell phone ALLEN handed to CBP Officers was an Android. While manually searching ALLEN's cell phone, an HSI Special Agent viewed the phone settings, which indicated the following details: Model & Hardware: E504, Android version: 8.1.0, Serial Number: JANK2030003596, IMEI (Slot 1): 358204104361304, IMEI (Slot 2): 358204104561309.

27. During CBP Officers inspection of ALLEN's luggage, they discovered a second cell phone, which was located in the side pocket of ALLEN's purse. This cell phone was an iPhone. ALLEN voluntarily provided the passcode to the iPhone. CBP Officers also observed ALLEN's behavior change once the iPhone was discovered, including noting that her hands seemed to be jittery. CBP Officers handed ALLEN's iPhone to an HSI Special Agent who conducted a border search of the iPhone. While manually searching ALLEN's second cell phone, an HSI Special Agent viewed the phone settings, which indicated the following details: Model:

9

iPhone 11 Pro, Serial Number: F17ZJA9XN6XQ, IMEI: 35324210167320 1, ICCID: 8901050120211744046, MEID: 35324210167320, and Phone Number: +1 (876) 587-0634. Your affiant notes that this is the same phone number provided for ALLEN by Co-Conspirator #1 described in paragraph 23 above.

## ANALYSIS OF ALLEN'S PNC BANK ACCOUNT

28.     This investigation has identified multiple accounts of ALLEN in the United States which have received fraudulent funds directly derived from this scheme. One of those accounts has been identified as a PNC Bank account. On March 20, 2020, a subpoena was served on PNC Bank requesting financial information related to checking account number 1235165824. Requested information received from PNC Bank indicates that from October 15, 2019, to the August 21, 2020, checking account number 1235165824 had a sole owner of Shelian ALLEN with a listed address of 139 Stonebrook Vista, Falmouth, Jamaica.

29.     Bank records obtained for ALLEN's PNC Bank account show there were only two deposits into her account, other than her initial account opening deposit. On February 14, 2020, there was a deposit of a Fox Communities Credit Union Check #26444 in the amount of $6,000 from Victim-1, and on April 22, 2020, there was a deposit of a Fox Communities Credit Union Check #1344 in the amount of $4,000 from Victim-1, totaling $10,000. These deposits are consistent with ALLEN being one of the primary beneficiaries of the scheme as the money from Victim-1 went directly to ALLEN's account.

30.     Bank records were obtained for ALLEN's PNC Bank account From February 18, 2020, to February 24, 2020 (when international travel confirms ALLEN was in the United States as described in paragraph 25 above). Those records indicate that there were six (6) ATM withdrawals from various ATMs located in Florida for a total withdrawal amount of $1,731.90

10

during that time period. Records also indicate there were three (3) debit card purchases at La Quinta Inns for a total amount of $831.68 from that account. Additionally, records indicate there were 24 purchases at various retailers in Florida including, but not limited to: Gap Outlet, Marshalls, Macy's, Foot Locker, Old Navy, Elegance Perfume, Polo/Ralf Lauren, and Victoria's Secret for a total amount of $2,440.43. The total amount withdrawn from the account from these transactions was $5,004.01.

31.     Bank records were also reviewed for ALLEN's PNC Bank account between April 29, 2020, to May 11, 2020 (when international travel indicates ALLEN travelled back to Jamaica). Those records indicate that there were ten (10) ATM withdrawals from various ATMs located in Falmouth, Jamaica, and other cities in Jamaica for a total withdrawal amount of $3,453.95. Records indicate that on May 11, 2020, the daily balance of the account was $46.48.

32.     Between June 8, 2020, until August 21, 2020, when the account was closed, the only transactions on ALLEN'S PNC account appear to be monthly bank fees.

33.     Analysis of the records provided by PNC Bank did not appear to show any normal employment-based deposits into the account, nor was there money being deposited into the account on any regular weekly or bi-weekly intervals from other sources. Additionally, there appear to be no normal living expense withdrawals from the account, such as housing payments, cellphone, or other utility bills.

34.     Your affiant knows from his training and experience that the above-described conduct is consistent with an individual who opens an account to quickly receive fraudulently obtained money and then removes the funds prior to any fraud being detected. Therefore, your affiant believes that ALLEN opened the account with the main purpose of receiving the funds from Victim-1.

## OTHER CO-CONSPIRATORS IDENTIFIED

35.   As part of this investigation, law enforcement has identified six co-conspirators who are part of the *Allen Lottery Scheme Organization*.

36.   The co-conspirators were identified as a result of law enforcement's review of Victim-1's banking information during the period of time she received the calls regarding her winning of the lottery. More specifically, the investigation revealed that:

   a. **Co-Conspirator #2** – Victim-1 was directed to send money, totaling $17,000, to accounts at two different financial institutions in the United States controlled by Co-Conspirator #2. As directed, Victim-1 made three separate payments, each under $10,000, into those accounts. Your affiant knows from his training and experience those involved in criminal activity attempt to avoid having money transfers reported by banks. In order to avoid the reporting requirements, criminals often limit transactions to under $10,000 to structure the payments in an effort to make them appear to be under the required reporting threshold.

   b. **Co-Conspirator #3** – Victim-1 was directed to send three checks, totaling $7,500, to an account at a financial institution in the United States controlled by Co-Conspirator #3.

   c. **Co-Conspirator #4** – Victim-1 was directed to send three checks, totaling $20,000, to an account at a financial institution in the United States [controlled by Co-Conspirator #4?]. As directed, Victim-1 made three separate payments, each under $10,

    d. **Co-Conspirator #5** – Victim-1 was directed to send one check totaling $20,000 to an account at a financial institution in the United States [controlled by Co-Conspirator #5?].

    e. **Co-Conspirator #6** – was identified as the individual who deposited a $20,000 check into Co-Conspirator #5's account. Your affiant knows that those involved in criminal activity often attempt to use others to make large deposits into bank accounts in an attempt to insulate themselves from the criminal conduct.

37. A review of numerous accounts tied to this organization revealed a loss amount in excess of $1.69 million. Moreover, in addition to Victim-1 located in the Eastern District of Wisconsin, 16 additional vulnerable and/or elderly victims have been identified around the United States. Of the total $1.69 million loss amount, over $128,000 was directly sent to ALLEN.

## CONCLUSION

38. Based on the forgoing, I respectfully submit that there is probable cause to believe that ALLEN conspired to commit fraud by wire, and conspiracy to commit fraud by mail in violation of 18 U.S.C. § 1341, 1343, and 1349.